[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves a claim for damages arising out of a breach of what in effect is claimed to be an oral contract. A good discussion of the principles involved in a case of this type is set forth in Contracts 3d ed, Calamari Perillo, § 1-2 at page 19:
 When the parties manifest their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact. If A telephones a plumber to come to A's house to fix a broken pipe, it may be inferred that A has agreed to pay the plumber a reasonable fee for his services although nothing is said of this. The contract is partly express and partly implied in fact. There are cases of contracts wholly implied in fact. The distinction between this kind of contract expressed in words in unimportant: both are true contracts formed by CT Page 5114-BBB a mutual manifestation of assent.
 A contract implied in law is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended.
Here the defendant who is an attorney and Mr. Dale Kroop met on a trip and after that maintained a social relationship. The attorney represented a company owning land in South Windsor. On February 6, 1989 the attorney wrote a letter to Mr. Kroop. He enclosed a copy of a survey for this land "which we would like updated and recertified to the Connecticut National Bank." He asked Kroop: "Please call me upon your receipt hereof to let me know how long it will take you to provide such an update." Mr. Kroop did not work in that section of the plaintiff company that completed surveys — he was a grants coordinator. But the defendant knew that, he addressed Kroop as such in the February 16 letter, and this did not prevent the defendant from sending Kroop a letter which in effect at least expressed a desire to enter into a contractural relationship with the plaintiff to survey land. Kroop did in fact get in touch with Robert Weaver, an office manager of the plaintiff who sent a proposal to the defendant. This proposal is a contract offer. It indicates the type of survey the plaintiff was willing to provide — a class A-2 survey. This is a word of art in this business; what it means is known to both providers of this product and people who request it. There was no serious contention that a class A-2 survey was not an understandable contract term at the trial. In fact the proposal generally describes the survey and what services are not included but can be provided if so desired. The fees for the service are spelled out. The proposal says the work would be "completed in approximately 30 — 45 days from your notice to proceed." Paragraph IV(4) of the proposal says that: "A retainer of $1,000. will be required before work commences. The retainer will be applied to the final invoice." Section V of the proposal is entitled "Contract/Notice to Proceed." It then says: "If this proposal meets with your approval, please execute one copy and return it to our office with the $1,000. retainer. This will serve as our notice to Proceed and Contract."
This proposal is a contract offer and if accepted it would be a binding contractural obligation between the parties — or to put it another way it is a contract offer capable of being so accepted so that a contractural relationship can be created. The CT Page 5114-CCC proposed agreement is definite and certain as to its terms and requirements, Augeri v. C.F. Wooding Co., 173 Conn. 426,429-430 (1977); there is no indefitness or uncertainty as to any essential element of the proposed contract offer, cfCorbin on Contracts, Rev. ed. (1993) § 4.1 page 525.
For both sides, the plaintiff and the defendant, time was of the essence. If the plaintiff were to be able to fit this survey job in its work schedule it had to know fairly quickly after the proposal was made that it was accepted. Mr. Kroop testified that the defendant "mentioned a very short window to perform the services."
The defendant did not respond to the proposal for several days and apparently because of the time pressures Mr. Kroop called the defendant. Kroop testified he called "looking for" the retainer and signed proposal. He said he expressed concern to the defendant about scheduling problems. Kroop testified the defendant "verbally told us to proceed, told me to tell us to proceed, which I then told our office manager (Mr. Weaver) to proceed and which he did."
If in fact this conversation occurred the proposal of the plaintiff was accepted and an oral contract was created to do this survey. The portion of the proposal referring to the need for a retainer and requiring the offeree to sign the proposal, precedent to any contractural obligation on the plaintiff's part to do the survey, was created for the plaintiff's benefit. Failure of the plaintiff to demand that those conditions be met would not prevent contract formation on the notion that the substantive terms of the contract were vague. As noted in Cavallo, et al. v. Lewis, 1 Conn. App. 519,520 (1984): "Any qualification of or departure from the terms in which the offer was made by the offeror, however, invalidates the offer unless the offeror agrees to the qualification or departure." Here the "offeror" agreed to the acceptance absent the conditions originally demanded by the unequivocal act of starting work on the project. Although of course the Uniform Commercial Code has no application to the problem before the court some of the general principles it sets forth as to contract formation are instructive and should at least be considered since a uniform approach to deciding these issues, no matter what the area of commercial activity, would be helpful to courts and especially parties about to or attempting to entering contractural relations. In this regard Section 42a-2-207(3) states CT Page 5114-DDD that: "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the title." Perhaps more to the point Section 42a-2-209 states: "(1) An agreement modifying a contract within this article needs no consideration to be binding."
If Mr. Kroop's testimony is to believed then, the defendant accepted the plaintiff's proposal and the plaintiff agreed to that acceptance despite the fact that the defendant's acceptance did not comply with a portion of the proposal — no contract until retainer received and proposal signed.
The question before the court is whether the defendant accepted the proposal of the plaintiff or at least its terms absent the ones just referred to so as to result in the formation of an oral contract. It is a question of fact as to whether there has been acceptance of a contract, John Brennan Construction Corp.,Inc. v. Shelton, 187 Conn. 695, 709 (1982), Bridgeport PipeEngineering Co. v. DeMatteo Construction, Co., 159 Conn. 242, 249
(1970).
First the court should state that I do not accept for a moment the proposition that any of the witnesses who testified in this case took the stand and intentionally misrepresented facts or actions that they took. All witnesses testified in a professional way and their demeanor belied any notion that such conduct occurred. Significantly no manufactured paper trails were created or left by any of the witnesses to buttress a court position that they knew they would have to take at the time of trial. In fact just the opposite is the case — things were done or said prior to trial which required explanation if their courtroom testimony was to be accepted.
Obviously on the critical issue of Kroop's testimony and the defendant's response to that testimony there are entirely different versions as to what was said or not said. But it is too simplistic and convenient to analyze this issue as depending on this court deciding who was lying and who was telling the truth. What is in fact indisputable here is that this case came to trial on dates in January and February of 1996. Suit was brought in October of 1991. The events around which this dispute developed happened in February CT Page 5114-EEE of 1989, some seven years prior to trial.
(1)
Mr. Kroop explicitly remembered that he called the defendant inquiring about the retainer and the signed proposal not being returned to the plaintiff's office. He would certainly have reason to remember the call, his company was offering to do the work and both sides had limited time frames regarding whether the work could or need be done. Mr. Kroop said the defendant told him to proceed with the work. This certainly does not conflict with the contents of the February 6th letter indicating that the defendant would like the work done. Mr. Weaver, an office supervisor, and supervisor of this type of work for the plaintiff company testified Kroop told him the defendant indicated he wanted the work to proceed and Weaver in fact had the work started to make the survey referred to in the proposal. It is difficult for the court to believe that both these men lied relative to the conversations just mentioned. At the time these events occurred Kroop was a friend of the defendant. Both Weaver and Kroop indicated the plaintiff was very busy with other work at the time so it is difficult to see why Kroop would feel under any pressure to invent this conversation with the defendant just to draw more business into the firm. Mr. Kroop did not even work in the section of the plaintiff's business that performed survey work of this type. I do not even know how these men, Kroop or Weaver, were paid — on a salary or commission basis. In fact proof that the conversation took place as Kroop testified is the fact that the work was begun.
To impeach Kroop's testimony the defendant points to the fact that work commenced despite the fact that a retainer was never received by the plaintiff and the signed proposal was not returned to the plaintiff's office. Also the work order which actually authorized the work to go forward was not signed by a principal of the plaintiff; this was not universally done according to Weaver but was the general practice. Failure of the principal to sign was in violation of the plaintiff's normal operating procedures. The defendant also testified he told Kroop to contact Wharton, the landowner, for the retainer and the acceptance. All of this, to the defendant, indicates Kroop and Weaver acting without internal authorization from superiors or external authorization from Wharton performed unauthorized work and "are now seeking to remedy their mistakes by holding the Defendant responsible."
But why would they order unauthorized work to be done in the CT Page 5114-FFF first place? How can it be explained as a simple paperwork mistake when Kroop testified he called about the retainer both before and after the actual work commenced? What makes more sense is that Kroop felt the defendant wanted the work done, a reasonable supposition given the February 6th letter, and considering he knew he was dealing with an attorney he was friendly with, he told Weaver the work should go forward without the retainer or singed [signed] proposal having been received. Kroop knew he was not following ordinary procedure in telling Weaver to commence work under these circumstances, that's why he called the defendant after work commenced. Why would Kroop even admit to such a call unless it was made for these motives? Weaver also testified that a surveyor, on the job, John Tarbox, to his knowledge contacted the land owner to tell them the plaintiff's workers were entering the land to do the survey. This was hearsay but it was unobjected to and it is reliable hearsay because obviously, as was testified to, plaintiff's employees would not enter land to do a survey such as this without notifying the landowner. If Kroop or Weaver knew that the work was not authorized or contracted for by the defendant or Wharton why would anyone working for the plaintiff contact the landowner about their need to be on the property to do this work? The defendant makes something of the fact that he was not notified about the fact that work had commenced. But Tarbox apparently notified Wharton. Even if the latter fact is not accepted, Kroop and Weaver would know that at least according to the contract proposal the plaintiff's work crews could be on the Wharton property for 30 — 45 days. Does it make any sense to think either one would let unauthorized work be performed on this land or that they would not appreciate the fact that the presence of surveyors on the land could not get back to Wharton and/or the defendant, Wharton's lawyer? A rather unusual scheme to cover up their mistakes.
The defendant contested Kroop's testimony. He said he did not tell Kroop to proceed with the work and that he told Kroop to contact Wharton, the landowner for the retainer. But if that is the case why would Kroop authorize the work to proceed or call the defendant again when the retainer was not paid after the work commenced.
This is a difficult case because the court believes it had three witnesses attempting to honestly reconstruct historic events that occurred seven years before trial. I believe the plaintiff has proved its case on the existence of a contract by a preponderance of the evidence however for some of the reasons CT Page 5114-GGG stated previously.
Also I conclude that the two witnesses for the plaintiff had much more reason to remember the events important to a resolution of this case. Their company actually did the work. Apparently the defendant's client had lost interest in having the survey done and although the landowner was a client of the large firm he was then associated with the defendant was approached by another lawyer in the firm who actually appears to have represented the client. The defendant's memory at trial left something to be desired — he at first did not remember that he received an invoice regarding this project and more importantly did not remember receiving the plaintiff's proposal to do the survey. His memory was refreshed by a letter he wrote in June of 1989 to counsel for the plaintiff. Then he conceded he received the proposal and the invoice. Is this unusual or surprising? — not as to events occurring seven years in the past. The court cannot make the same negative assumptions concerning this that the plaintiff seems so ready to make. After all the June letter the defendant wrote plaintiff's counsel was the very piece of evidence that confirmed he received the proposal — an odd ploy for someone to take who, as the plaintiff claims, was trying not to be candid with the court. I do not accept that position of the plaintiff. But on the basis of the above discussion I conclude that Mr. Kroop's memory of the important conversation here is believable and there was an oral contract accepted by the defendant.[1] It should be noted that the court has not discussed an agency defense or the fact that the defendant as an attorney was representing a third party. No such special defense was filed and in his answer the defendant denied that he was an agent for or had an interest in the subject property.
(2)
Mr. Weaver testified the work for the survey was performed and completed. An invoice charging $5,500. according to the terms of the written proposal was sent to the defendant. The invoice introduced into evidence is dated March 29, 1989. In his June 1989 letter to plaintiff's counsel the defendant acknowledges he began receiving invoices in April of that year. To do the work people were sent out to the property with survey instruments and equipment. Mr. Weaver went to the property also.
There was testimony that because the retainer was not paid the necessary certifications were not placed on the survey and other redrafting was not completed. Mr. Weaver who had long experience CT Page 5114-HHH in this field and seemed failure with the subject he was testifying about said this added work if completed would have represented $500. worth or work. Therefore the court concludes that the plaintiff substantially performed its contract obligation and judgment should enter in the plaintiff's favor.
The traditional rule in Connecticut regarding damages in contract cases has been set out in Argentinis v. Gould, 219 Conn. 151,157 (1991).
 "It is axiomatic that the sum of damages awarded as compensation in a breach of contract action `should place the injured party in the same position as he would have been had the contract been performed. . . .' The injured party, however, `is entitled to retain' nothing in excess of that sum which compensates him for the loss of his bargain."
Connecticut follows the "actual loss" concept set forth in 3 Restatement (Second) § 347 comment (e). This concept accounts for the possibility that the breach may result in some savings the injured party would have incurred if he or she had had to perform,219 Conn. at p. 158.
This appears analogous to a general rule in construction contract cases that: "If the work has commenced the contractor is entitled for a total breach to the unpaid contract price less the amount it would have cost him (sic) to complete his (sic) performance." Contracts (3d ed) Calamari Perillo § 14-28, pp. 632-633. This is not the universal rule but as Calamari notes the other rules often arrive at the same result.
From the contract price of $5,500. the sum of $500. should be deducted since this represents performance not completed by the plaintiff. Judgment should enter in the amount of $5,000.[2]
Thomas Corradino, Judge